UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCELLA BROWN,

Plaintiff,

v.

OAKLAND COUNTY,

Defendant.

_____/

Case No. 14-cv-13159

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
MICHAEL J. HLUCHANIUK

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [28], AND
DENYING PLAINTIFF'S MOTION SEEKING A SANCTION OF ADVERSE INFERENCE BASED
ON DEFENDANT'S SPOLIATION OF ELECTRONICALLY STORED INFORMATION [31]**

## I. INTRODUCTION

On April 22, 2015, Marcella Brown ("Plaintiff") filed a Second Amended Complaint against her former employer, Oakland County ("Defendant"). *See* Dkt. No. 23. In the Second Amended Complaint, Plaintiff raises seven counts alleging that Defendant wrongfully discriminated and retaliated against her on the basis of her age, race, and participation in a protected activity—namely, filing a worker's compensation claim. *Id.* Specifically, Plaintiff asserts that her rights have been violated pursuant to the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("Section 1981") (Count I); Title VII of the Civil Rights Act of 1964 and 1991 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* (Count II); the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count III); the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), MICH. COMP. LAWS § 37.2102 *et seq.* (Counts IV, V and VII); and the Workers Disability Compensation Act ("WDCA"), MICH. COMP. LAWS § 418.301 et seq. (Count VI). *Id*

Presently before the Court are Defendant's Motion for Summary Judgment [28] and Plaintiff's Motion for Sanctions [31]. Both motions are fully briefed, and a hearing was held on

September 2, 2015. After listening to the argument of the parties, reviewing the briefs, and reviewing the record, the Court will **GRANT** in part and **DENY** in part Defendant's Motion for Summary Judgment [28] and **DENY** Plaintiff's Motion for Sanctions [31]. The Court's Opinion and Order is set forth in detail below.

## II. BACKGROUND

Plaintiff is a Mexican-American woman who began working for Defendant in December of 2008. In September of 2013, Plaintiff began working for the Family Division of the Oakland County Circuit Court. Plaintiff held a provisional appointment in the Family Division where she worked as a Full Time Office Assistant I and was subject to a six-month probationary period before she would be officially employed with Defendant. She was assigned to work at the Office of the Friend of the Court ("FOC").

According to Defendant, Plaintiff was unable to successfully complete her probationary period and her provisional appointment to the position of Office Assistant I was terminated on February 7, 2014 for "Failure to Complete Probationary Period." Suzanne Hollyer, the appointed Friend of the Court, filled out Plaintiff's probationary end report and also met with Plaintiff to inform her of her termination. Hollyer states she became aware of issues regarding Plaintiff's work performance one day before Plaintiff was terminated—February 6, 2014. There were three stated issues regarding Plaintiff's work performance that had been brought to Hollyer's attention, and allegedly led to the termination.

The first issue related to a customer who came into the FOC looking to obtain a print-out of her account. Plaintiff advised the customer that she would have to pay for the print-out. The customer became upset and Plaintiff called Deputy Friend of the Court Pete Dever for assistance. Dever provided the woman with a print-out free of charge. According to Defendant, the way

Plaintiff reacted to Dever's response to the situation was a problem because interviews with staff purportedly revealed that Plaintiff was upset that Dever undermined her. Defendant claims that this, as opposed to the headache Plaintiff claimed to have, was the real cause of Plaintiff's early departure as Plaintiff purportedly told her co-workers that she may not return. The second issue involved a situation where a FOC Referee sent someone to the front desk for help with modification of an order. Plaintiff allegedly acted in an inappropriate manner by emailing Dever directly for assistance as opposed to following the proper chain of command by contacting her immediate supervisor.

Defendant maintains that the "main catalyst" in Hollyer's decision to terminate Plaintiff stemmed from her interviews with Plaintiff's co-workers relating to Plaintiff's behavior in the workplace. According to Defendant, Plaintiff's co-workers described her as threatening, hostile, and confrontational in nature. Defendant states Hollyer relied on interviews taken from Rebecca Rudolph, Susan Jasmund, Kelly Morelli, and Kelly Castillo. Defendant contends that all of these individuals said Plaintiff's behavior was viewed as aggressive and hostile.

For example, Defendant cites testimony from Rudolph where Rudolph explained that Plaintiff was always crying at work. Defendant also cites Rudolph's testimony about the account printout situation, as Rudolph claims that Plaintiff had posted on her Facebook account that she felt undermined at work. Rudolph claims she witnessed Plaintiff "crying hysterically over the situation." Rudolph described Plaintiff's behavior in the workplace as "overemotional" and claimed that Plaintiff would give everybody a hard time. Defendant also emphasizes Rudolph's testimony where Rudolph stated that she was having bad anxiety issues and was arguing with others "over having to work with [Plaintiff]." Rudolph purportedly reported her concerns to her direct supervisor, Julie Izzo, shortly before Plaintiff was terminated.

Based on the information Izzo learned from Rudolph regarding the customer issue with the account printout, Izzo interviewed Jasmund, Morelli, and Castillo. Izzo claims these employees had the same concerns as Rudolph. Izzo reported this information to her supervisor, Pam Sala and relayed the concerns to Hollyer. Sala, Izzo and Hollyer all purportedly met to discuss their concerns. Izzo claims she did not recommend Plaintiff be failed on probation. Instead, Defendant emphasizes it was Hollyer who made the final decision. After evaluating the situation, Hollyer testified that she terminated Plaintiff's employment because of Plaintiff's behavior, inability to handle supervision, and inability to work well with her co-workers.

Plaintiff describes a different set of factual circumstances that led to her termination. For example, just prior to her termination, on January 29, 2014, Plaintiff explains that Izzo scored Plaintiff as "Outstanding or Above Average" in all categories of a Performance Appraisal. This outstanding rating included cooperation with fellow employees and cooperation with supervision. Notwithstanding this evaluation, Plaintiff notes she was terminated nine days later.

Plaintiff claims that her race and age were reasons for her termination. To support her claim, Plaintiff explains how her younger and non-Latino co-workers were treated differently. For example, Plaintiff explained a situation where Izzo told her that her co-worker, Tiffani Preston—an African-American twenty-three years old hired on the same day as Plaintiff—was going to work with the county a lot longer than Plaintiff because Preston was younger. Plaintiff states that Dever told Preston, "I'm going to show [Preston] the ropes. I'm going to take her under my wing." Plaintiff states that she found this statement offensive and discriminatory. Plaintiff states that Izzo learned that Plaintiff had complained about this comment and felt unfairly treated. Plaintiff contends that Izzo immediately contacted Hollyer to report Plaintiff's age discrimination claims and to orchestrate Plaintiff's termination.

Plaintiff also contends that Izzo was upset about a worker's compensation claim that Plaintiff filed after she fell in the parking lot. Plaintiff asserts that a few days after the fall, Julie Sweik, Defendant's Risk Management Claims Analyst, told Plaintiff that she was entitled to worker's compensation.  When Plaintiff told Izzo, Izzo allegedly became irate and yelled, "those people are so f**king stupid. Why would they f**king tell me one thing and you another?" Later, after Sweik told Izzo to correct Plaintiff's time sheets to reflect time off work related to the injury, Izzo apparently complained, "this is a real pain in the a**."  Plaintiff asserts that Izzo was so irate about her worker's compensation claim that Izzo refused to process it appropriately. This allegedly led Defendant's claims processor to inform Sweik that the claim had still not been reported fifteen days after the incident.

Plaintiff also claims Izzo also would not authorize Plaintiff's time at the doctor, and Plaintiff had to seek assistance from Sweik. Two days before Plaintiff's termination, Rudolph purportedly told Izzo about Plaintiff's Facebook post complaining about the mishandling of her worker's compensation claim. The day before her termination, Izzo informed Hollyer about Plaintiff's complaint that her worker's compensation claim had been mishandled. Additionally, Dever—who allegedly once referred to Plaintiff as "our own little Mexican"—told Plaintiff's husband, "your wife is probably going to sue us for her fall in the parking lot."

Thus, Plaintiff argues that her attitude had nothing to do with her termination. Plaintiff contends the proffered explanations are merely a pretext. Plaintiff explains that when she left work early after the printout issue she left because "I was working by myself, my hand was throbbing, I had a migraine, it was all of those things[.]"  Plaintiff maintains that the office policy was that anyone could leave if they were not feeling well and that she received permission to leave.  With respect to the email issue, Plaintiff indicates that her co-worker informed her to send

the email, she was not aware of a chain of command, no one ever indicated that there was a chain of command policy, and no one could identify a written chain of command policy. It is with these contrasting positions regarding Plaintiff's termination that the Court must consider the instant Motion for Summary Judgment.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) empowers the court to render summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 252. There must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

## IV. DISCUSSION

Presently before the Court are Defendant's Motion for Summary Judgment [28] and Plaintiff's Motion Seeking a Sanction of Adverse Inference Based on Defendant's Spoliation of Electronically Stored Information [31]. A finding that Defendant is entitled to summary judgment would make the latter motion brought by Plaintiff moot. Accordingly, the Court will first address Defendant's Motion for Summary Judgment.

### A. Defendant's Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment on all of Plaintiff's claims. *See* Dkt. No. 28. Defendant breaks its argument up into four distinct sections addressing (1) Plaintiff's claims for discrimination on the basis of race, ethnicity or national origin (Counts I, II, and IV); (2) Plaintiff's claims for age-based discrimination (Counts III and V); (3) Plaintiff's claim for retaliation under the WDCA (Count VI); and (4) Plaintiff's claim for retaliation under the ELCRA (Count VII). *See id.* The Court finds Defendant is entitled to summary judgment on Plaintiff's hostile environment claims, but nothing else. A detailed analysis is below.

-7-

1. **Counts I, II, and IV—Defendant is not entitled to summary judgment on Plaintiff's race-based claims with respect to disparate treatment, but is entitled to summary judgment with respect to her hostile work environment claims.**

Defendant first argues that it is entitled to summary judgment with respect to all of Plaintiff's claims that she was discriminated against on the basis of her Mexican-American heritage. These claims were brought pursuant to Section 1981 (Count I), Title VII (Count II), and the ELCRA (Count IV). Here, Plaintiff alleges that Defendants violated Section 1981 by discriminating against Plaintiff "based upon her race, ethnicity or national origin, took adverse action toward her, *and* created a hostile work environment[.]" Dkt. No. 23 at ¶ 35; *see also id.* at ¶ 42 (claiming same for violation of Title VII); *id.* at ¶ 55 (claiming only an adverse action took place with respect to the ELCRA). After reviewing the arguments put forth by the parties, the Court does not find that Defendant is entitled to summary judgment with respect to Plaintiff's disparate treatment claims. However, the Court does find that Defendant is entitled to summary judgment with respect to Plaintiff's hostile work environment claims.

a. **Defendant is not entitled to summary judgment with respect to Plaintiff's race-based disparate treatment claims.**

Section 1981 prohibits racial discrimination in the making and enforcing of private contracts. *See* 42 U.S.C. § 1981. Title VII makes it unlawful for an employer "to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The ELCRA forbids like conduct. *See Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 824 (E.D. Mich. 2009).

"The elements of [a] prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981." *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 573 n. 5 (6th Cir. 2000) (citing *St. Mary's Honor Ctr. v. Hicks,* 509

U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Moreover, "[c]laims of race discrimination under Title VII and the [ELCRA] can be analyzed together because Michigan courts frequently 'turn to federal precedent for guidance in reaching [their] decision' to determine whether a claim has been established in discrimination cases." *Curry*, 669 F. Supp. 2d at 824 (citations omitted). Ultimately, the "question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

To withstand summary judgment on a disparate treatment claim, Plaintiff must either "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.,* 319 F.3d 858, 864–65 (6th Cir. 2003). In the absence of direct evidence, Plaintiff may prevail if she can establish an inferential case of discrimination under the *McDonnell Douglas* framework. *See Curry*, 669 F. Supp. 2d at 824-25 (referencing *McDonnell Douglas v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

### i.   Plaintiff cannot proceed on a direct evidence theory.

This Court finds that Plaintiff cannot proceed on a direct evidence theory. "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful [discrimination] was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods., Inc.,* 515 F.3d 531, 543–44 (6th Cir. 2008). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *In re Rodriguez,* 487 F.3d 1001, 1007 (6th Cir. 2007) (citation omitted).

-9-

"Direct evidence is a manifestation of actual discriminatory intent by a decision maker, 'such as an explicit statement' that the employer was acting on the basis of a protected status." (quoting *Imwalle,* 515 F.3d at 544). "Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed." *Amini v. Oberlin College,* 440 F.3d 350, 359 (6th Cir. 2006). "Statements that require an inference to determine discriminatory motivation are not direct evidence." *Curry*, 669 F. Supp. 2d at 825 (citing *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 238–39 (6th Cir. 2005), which found in a gender discrimination case, that an interview committee member's statement that they wanted a "grass roots guy" was not direct evidence).

In this case, Plaintiff points to a statement made by Pete Dever who Plaintiff states "regularly referred to [Plaintiff] as the Court's 'own little Mexican at the front desk.'" Dkt. No. 23 at ¶ 13. However, according to Defendant "[a]ssuming arguendo that the comment was made exactly as described by Plaintiff, there is no evidence of racial animus on the part of Pete Dever," because "[a]s [] established through Plaintiff's deposition, the alleged statement, if made, was done in a complimentary fashion and it was a one-time occurrence." Dkt. No. 28 at 11 (referencing Dkt. No. 28-7 at 4, 11, where Plaintiff indicates that the statement was only made once when Mr. Dever was "bragging" about her because she could speak Spanish).

Mr. Dever contends that he never referred to Plaintiff as the Court's little Mexican at the front desk. *See* Dkt. No. 30-17 at 6. Even construing the facts in the light most favorable to the non-moving party, the Court agrees that Plaintiff cannot proceed on a direct evidence theory because there is "no evidence that Dever exercised any authority over the hiring and firing of the Plaintiff." Dkt. No. 28 at 20. Assuming Mr. Dever made this comment *and* it evinces racial animus—the latter having not been shown—Plaintiff has not shown that Mr. Dever's intent to

discriminate could be imputed to the ultimate decision maker in Plaintiff's termination. The Sixth Circuit has indicated that a plaintiff may show discrimination by offering evidence of a "'causal nexus' between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus." *Madden v. Chattanooga City Wide Serv. Dep't,* 549 F.3d 666, 677 (6th Cir. 2008). In other words, "Plaintiff must show that '[b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw.'" *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012) (quoting *Madden*, 549 F.3d. at 678). Plaintiff does not make this showing. There is no statement "which, if believed, requires no inferences to conclude that unlawful [discrimination] was a motivating factor in the employer's action." *See Imwalle,* 515 F.3d at 543–44. Accordingly, Plaintiff cannot proceed under a direct evidence theory.

### ii. Plaintiff can proceed under a circumstantial evidence theory.

Although Plaintiff cannot proceed under a direct evidence theory, Plaintiff can proceed under a circumstantial evidence theory. To establish an inferential case of disparate treatment based on race, plaintiffs must proceed under the "the burden-shifting framework first set forth in [*McDonnell Douglas*]." *Blair v. Henry Filters, Inc.,* 505 F.3d 517, 524 (6th Cir. 2007) (citing *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 547 (6th Cir. 2004); *Town v. Mich. Bell Tel. Co.,* 455 Mich. 688, 695, 568 N.W.2d 64, 67–68 (1997)). The Sixth Circuit has summarized the *McDonnell Douglas* framework as follows:

> Under the *McDonnell Douglas* burden-shifting framework, once the plaintiff establishes a prima facie case of intentional discrimination, the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times. Once the defendant has articulated a nondiscriminatory reason for its decision, the presumption of discrimination that arises from the plaintiff's prima facie case disappears and the plaintiff must have the opportunity to show that the defendant's proffered explanation is merely a pretext for discrimination.

-11-

*Weigel v. Baptist Hosp.,* 302 F.3d 367, 377–78 (6th Cir. 2002) (internal citations omitted). Plaintiff's claims survive this burden-shifting framework for this summary judgment motion.

**Prima Facie Case**

Generally speaking, plaintiffs alleging employment discrimination in employee discipline must make a four-part showing in order to set forth a *prima facie* case of discrimination: they must show that they 1) are a member of a protected class; 2) are qualified for the job; 3) suffered an adverse employment decision; and 4) were "replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *See Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (citation omitted). Here, there does not appear to be a dispute that Plaintiff was a member of a protected group, that she was qualified, and that she was subject to an adverse employment decision. *See Vincent v. Brewer Co.,* 514 F.3d 489, 495 (6th Cir. 2007) ("An employer's decision to discharge an employee is a classic example of an adverse employment action."). The dispute boils down to whether Plaintiff was treated differently than similarly-situated non-protected employees.

 "To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar 'in all of the *relevant* aspects.'" *Martin v. Toledo Cardiology Consultants, Inc.,* 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original)); *see also McMillan v. Castro,* 405 F.3d 405, 414 (6th Cir. 2005) ("The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'") (citation omitted). To be similarly-situated, employees generally must "have dealt with the same supervisor" and "have been subject to the same standards." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992).

At the hearing, Plaintiff clarified and emphasized that she was treated differently than her fellow non-Latino co-workers because "she 1) was not given the benefit of an interview to determine the veracity of the claims brought against her; and 2) was not provided with counseling and an opportunity to correct any concerns regarding her behavior, but rather was summarily terminated." Dkt. No. 30 at 22.[1]

Defendant argues that Plaintiff does not satisfy this similarly-situated requirement because Defendant contends that Plaintiff "completely fails to identify the 'younger, non-Latino coworkers' she is referring to when she makes this argument within her brief." *See* Dkt. No. 33 at 6 (citation omitted). Specifically, Defendant contends that "Plaintiff utterly fails to articulate or demonstrate how these . . . 'non-Latino' employees were 'nearly identical' to her but treated differently for comparably serious infractions." *Id.* at 6-7; *see also id.* at 6 (quoting *Grizzell v. City of Columbus,* 461 F.3d 711, 724 (6th Cir. 2006) to emphasize that "mere personal beliefs, conjecture and speculation are insufficient to support an inference of discrimination."); *id.* (quoting *Warfield v. Lebanon Correctional Institution*, 181 F.3d 723, 730 (6th Cir. 1999), to state that it is "the discrimination plaintiff's burden to establish that the other employee's acts were of '*comparable seriousness'* to his or her own infraction.") (emphasis in original). The Court disagrees with Defendant's position.

Contrary to Defendant's argument, Plaintiff specifically identifies similarly situated non-Latino coworkers who allegedly received differential treatment. Rather than go through all of the individuals in detail, the Court will focus specifically on Dana Harper.  Ms. Harper is an African American woman so she is a member of a different protected class. *See Tippie v. Tennessee Dep't of Revenue*, No. 10-2702-STA-DKV, 2012 WL 1900656, at *8 (W.D. Tenn. May 24,

---

[1] In the briefs Plaintiff indicates that, "to the extent [] her early departure two days before her termination in any way contributed to the termination decision, she was also treated differently than her . . . non-Latino co-workers in that they regularly arrived to work late and left work early, without consequence."  Dkt. No. 30 at 22-23

2012) (citing *Arendale*, 519 F.3d at 603, to explain that the fourth prong of a *prima facie* case requires showing "that he or she was treated differently than similarly situated employees *of a different protected class*.") (emphasis added).

Ms. Harper was employed with the FOC, had the same supervisor in Izzo, and was a probationary employee. *See* Dkt. No. 30-27 at 4.  Plaintiff points out that there is record evidence that other employees stated Ms. Harper "was not a friendly person" and "wasn't a team player." *See* Dkt. No. 30 at 19 (citing Dkt. No. 30-9 at 4 (Preston Dep.)); *see also* Dkt. No. 30-28 at 2 (10/10/14 Email to Julie Izzo from Rebecca Rudolph).  Additionally, Plaintiff points to evidence in the record stating that Ms. Harper apparently "'did not quite get along with everyone,' and got into a loud verbal argument' with another coworker while she was a probationary employee." *Id.* (quoting Dkt. No. 30-9 at 4 (Preston Dep.)); *see also* Dkt. No. 30-3 at 3-4 (Izzo Dep.). Plaintiff also cites record evidence to show that supervisors for Defendant counseled Ms. Harper more than once while she was on probation in order to "'find out what [Harper's] side of the story was," after hearing problems from co-workers about Ms. Harper. *See id.* at 19-20 (citing Dkt. No. 30-11 at 4-6 (Sala Dep.); Dkt. No. 30-3 at 4 (Izzo Dep.)).

Here, Plaintiff had the same supervisor in Izzo. She also had the same standards of employment as she was a probationary employee with the FOC. Finally, she allegedly engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. Indeed, Defendant states that Plaintiff  was terminated for her "inability to work well with supervision and her threatening and aggressive behavior in the work place." Dkt. No. 28 at 13. As discussed, however, the record contains instances where co-workers and supervisors for Defendant indicate that Ms. Harper was also unable to work well with supervision and exhibited aggressive behavior in the workplace.

For whatever reason, Ms. Harper was given counseling and mediation, and the claims against her on behalf of her counterparts were investigated. Construing the evidence in the light most favorable to the non-moving party, this did not happen with Plaintiff. Indeed, nowhere does Defendant indicate that Plaintiff was ever spoken with or talked to regarding the allegations against her involving her alleged hostile attitude and difficult nature.

To support the idea that others were treated differently, Plaintiff also points out other instances where there was differential treatment amongst similarly situated parties.[2] Critically, staff for Defendant indicated that they normally go through a process of counseling or meeting with troubled employees to give the employees a chance to explain themselves before failing them for their probation period. *See*, *e.g.*, Dkt. No. 30-3 at 4 (Izzo Dep.); Dkt. No. 30-11 at 6 (Sala Dep.); Dkt. No. 30-15 at 14 (Rudolph Dep.). This course of action was advised by Defendant's Supervisor of Labor Relations, who Plaintiff explains was "surprised to learn that no one had discussed Brown's supposed behavior issues with her." Dkt. No. 30 at 18 (citing Dkt. No. 30-26 at 3-4 (Kramer Dep.)). Overall, the record supports Plaintiff's contention that there was generally a procedure of at least speaking to probationary employees prior to failing them for their probation period. For whatever reason, that did not happen here. As such, construing the facts in the light most favorable to the non-moving party, the Court finds Plaintiff has set forth a *prima facie* case for disparate treatment under the *McDonnell Douglas* framework.

---

[2] For example, Plaintiff cites Ashley Hewitt as another example of differential treatment. Ms. Hewitt was another African American probationary employee. *See See* Dkt. No. 30-27 at 4. Plaintiff points out that Hewitt was arrested and accused of being affiliated with a drug dealer, but that Defendant conducted an investigation before terminating Hewitt. *See* Dkt. No. 30 at 20 (citing Dkt. No. 30-3 at 3 (Izzo Dep.); Dkt. No. 30-4 at 11-12 (Hollyer Dep.)). Additionally, Plaintiff points out that Jennifer McCarron, a Caucasian employee received an investigation and discussion after an accusation that she stole petty cash. *See* Dkt. No. 30 at 17 (citing Dkt. No. 30-3 at 12-13 (Izzo Dep.)) Lastly, Plaintiff points out that Tiffani Preston, "received counseling during her probation when a referee complained that her work quality was not to his standards." Dkt. No. 30 at 20 (citing Dkt. 30-9 at 6 (Preston Dep.)). In fact, Plaintiff contends that "Izzo contacted Preston, gave her some suggestions, and reviewed her work before it was submitted to the referee." Dkt. No. 30 at 20 (citing Dkt. No. 30-9 at 6-7).

**Legitimate Non-Discriminatory Reason**

As discussed, this *prima facie* showing is not the end of the inquiry. After the *prima facie* case is made, the burden shifts to the defendant to articulate a legitimate and nondiscriminatory reason for its actions. Here, Defendant provides the following nondiscriminatory justification:

> Here, Suzanne Hollyer articulated very clear, compelling, and non-discriminatory reasons for Plaintiff's failed probation. These reasons centered upon Plaintiff's inability to work well with supervision and her threatening and aggressive behavior in the work place. Plaintiff has not and simply cannot prove that race or national origin was in any way a factor in the decision to fail her on probation."

Dkt. No. 28 at 13. As mentioned earlier, the "defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times" such that the burden shifts back to Plaintiff to show "that the defendant's proffered explanation is merely a pretext for discrimination." *Weigel,* 302 F.3d  377–78

**Pretext**

"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans*, 668 F.3d at 839 (quoting *Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 (6th Cir. 2009)). "Defendant can overcome Plaintiff's claims of pretext if it is 'able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Id.* (quoting *Wright v. Murray Guard Inc.,* 455 F.3d 702, 707–08 (6th Cir.2006) (internal quotation omitted)).

"[I]n determining if plaintiff[] ha[s] raised a genuine issue of material fact as to pretext, [the Court] should consider not whether [the plaintiff] *actually* breached [the defendant's rules], but rather whether the [defendant] had an honestly held belief that [the plaintiff] had committed

[a violation of the rules]." *Allen v. Highlands Hosp. Corp.,* 545 F.3d 387, 398 (6th Cir. 2008).

The Sixth Circuit has given the following guidance in making that determination:

> [T]he key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action. An employer has an honest belief in its rationale when it reasonably relied on the particularized facts that were before it at the time the decision was made. [W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned.

*Id.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 598–99 (6th Cir. 2007)). The Sixth Circuit has explained that courts should not "micro-manage the process used by employers in making their employment decisions," but should also not "blindly assume that an employer's description of its reasons is honest." *Smith v. Chrysler Corp.*, 155 F.3d 799, 808 (6th Cir. 1998). When an employee produces sufficient evidence to establish that "the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Id.* at 807-08.

After following this guidance, and construing the facts in the light most favorable to the non-moving party, the Court finds that Plaintiff has put forth a compelling argument that Defendant did not reasonably rely on particularized facts before making its adverse decision. Plaintiff takes the position that "Defendant's own testimony has demonstrated that the three reasons given for Brown's termination are 'mistaken, foolish, trivial or baseless.'" Dkt. No. 30 at 25 (quoting *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 714 (6th Cir. 2007)).

Plaintiff correctly points out that Defendant provides three reasons for Plaintiff's termination: "[f]irst, 'two relatively small incidents,' one regarding a printout issue and the second . . . an email that [Plaintiff] sent to Dever, Izzo and others. Defendant claims, however, that the 'main catalyst' was 'behavior in the workplace.'" Dkt. No. 30 at 12 (referencing and

-17-

quoting Dkt. No. 28 at 12-13). Plaintiff puts forth sufficient evidence to establish that the proffered reasons put forth by Defendant are unworthy of credence, did not actually motivate the employer's action, and were insufficient to motivate the employer's action.

For example, Plaintiff undermines the printout issue and Defendant's assertion that Plaintiff did not accept feedback well by citing multiple instances in the record to support her position that she did nothing wrong and never got any negative feedback about this printout incident. *See* Dkt. No. 30-17 at 7 (Dever Dep.) ("Q. Had [Plaintiff] done anything wrong? A. Not that I could tell."); Dkt. No. 30-7 at 17 (Plaintiff Dep.) ("Q. You were not in any way verbally reprimanded? A. No."); Dkt. No. 30-11 at 6 ("Q. Okay. Did [Dever], in any way, claim that [Plaintiff] had done anything wrong? A. Only for the – Only for the fact that we don't charge – We weren't charging for the printouts at the time, but other than that no."); Dkt. No. 30-3 at 13 (Izzo Dep.) ("Q. Are you aware that during training [Plaintiff] was actually trained to charge for printouts if a free one had already been provided? A. No."); Dkt. No. 30-4 at 15 (Hollyer Dep.).

Moreover, Plaintiff cites the record to point out that "[n]either Izzo nor Hollyer asked Dever *before [Plaintiff's] termination* whether he provided 'feedback' or had concerns about the printout." Dkt. No. 30 at 14 (citing Dkt. No. 30-17 at 5, 7-8 (Dever Dep.); Dkt. No 30-4 at 5-6 (Hollyer Dep.)) (emphasis in original). In fact, the person who made the ultimate decision, Hollyer, seems to have acknowledged that there was not any feedback given to Plaintiff. Dkt. No. 30-4 at 15 (Hollyer Dep.); Dkt. No. 30-3 at 13 (Izzo Dep.).

Plaintiff's most persuasive point is that "Plaintiff left work early on February 5, 2014 with her supervisor's approval." *See* Dkt. No. 18 at ¶ 25. Plaintiff asserts that she left because she had a headache. Defendant attempts to undermine this contention claiming that "subsequent interviews with staff revealed that [Plaintiff] was very upset that Mr. Dever had 'undermined'

her and provided a print-out for free and that she left work early that day in a huff, telling coworkers she may never return." Dkt. No. 28 at 13 (citing Dkt. No. 28-11 at 3-4) (Hollyer Dep.)); *see also* Dkt. No. 28 at (citing Dkt. No. 28-12 at 1, 3 to state that Plaintiff allegedly told Ms. Rudolph that she "*couldn't take it anymore*" and may be leaving for good). To undermine this position taken by Defendant, Plaintiff emphasizes that all of Hollyer's testimony in support of its motion is hearsay because Hollyer never spoke with any of the subject individuals and her testimony is only a recitation of what Izzo informed her. *See* Dkt. No. 30 at 12-13 (referencing Dkt. No. 30-4 at 5-7 (Hollyer Dep.)). This is critical because Plaintiff cites to the record to explain that Defendant implicitly "acknowledged that testimony regarding why Brown went home early is pure speculation." Dkt. No. 30 at 26 (citing; Dkt. No. 30-3 at 19 (Izzo Dep.); Dkt. No. 30-15 at 11 (Rudolph Dep.); Dkt. No. 30-4 at 4 (Holyer Dep.)). The Cour agrees, as Defendant's argument appears to be speculation that runs counter to Plaintiff's position.

To counter Defendant's assertion that the email Plaintiff sent to Dever, Izzo and others played a role in the adverse decision, Plaintiff emphasizes that "Izzo testified that the email itself was not inappropriate, that Brown did not do anything wrong, and that she was not upset about it." Dkt. No. 30 at 25 (citing Dkt. No. 30-3 at 15 (Izzo Dep.) stating "A. I wasn't upset with her. I just indicated that I would appreciate her talking to me and I will address the appropriate supervisors, because I've asked the same thing of other supervisors, and that's how we do things. You follow chain of command."). *But cf.* Dkt. No. 30-17 at 7 (Dever Dep.) ("Q. All right. And is there any sort of written policy regarding that chain of command? A. No. Q. All right. It was just something you feel is how it should be handled? A. I think its a convention. Q. Okay. Based on. A. Practices that would be in the office.").

Though Defendants imply that Plaintiff did not follow a protocol in the office, Plaintiff rebuts this rationale by noting that Rudolph, who informed Plaintiff to send the email and who was "a nine year employee, did not know about a 'chain of command'" for sending emails to supervisors. *See* Dkt. No. 30 at 13 (citing Dkt. No. 30-3 at 16-17 (Izzo Dep.);  Dkt.  No 30-21 (2/6/14 Email to Julie Izzo from Marcella Brown); Dkt. No. 30-22 (2/6/14 Office Instant Message from Rebecca Rudolph to Julie Izzo)). Finally, Defendant argues that the concerns about the email are pretext because the record indicates Dever "does not recall the email, it must not have concerned him, and Defendant does not have a written policy regarding a chain of command."Dkt. No. 30 at 26 (citing Dkt. No. 30-17 at 6-7 (Dever Dep.)).

Turning our attention to what Defendant labels as the "main catalyst" behind Defendant's decision, Plaintiff strongly pushes back against Defendant's contention that Plaintiff was hostile, confrontational, and threatening. Perhaps the most persuasive position put forth by Defendant of Plaintiff's alleged hostile and threatening nature was the purported statement from Plaintiff that if anyone touched her personal belongings she would ". . . go from zero to b***h in two seconds." *See* Dkt. No. 28 at 15-16. However, Plaintiff points out that Rudolph testified, there was not a conflict," and could not "recall what conflicts we had." Dkt. No. 30-15 at 7-8. Moreover, Izzo seemingly acknowledges Brown's email exchange with Jasmund was not confrontational. *See* Dkt. No. 27 30 at 27 (citing Dkt. No. 30-25 at 2 (5/8/14 Email from Izzo to Jasmund); Dkt. No. 30-3 at 8-9, 14 (Izzo Dep.)).

After reviewing the evidence, it is hard for this Court to find that the employer had an honest belief in its rationale for its adverse decision. *See* Dkt. No. 30-3 at 9 (Izzo Dep.) ("Q. . . . Why didn't you ever discuss this with Ms. Brown? A. I didn't have any – I don't know. I don't have an answer. . . . I chose not to."). All things considered, the Court finds that Plaintiff has at

least pointed to sufficient record evidence to refute the contention that plaintiff was terminated because of an inability to work well with supervision. This is particularly so in light of Plaintiff's appraisal just nine days prior to her termination where she was rated as "outstanding" in the category of "cooperation with supervision." *See* Dkt. No. 30-1 at 2.

In sum, it is difficult to say that Defendant reasonably relied on particularized facts to determine Plaintiff was unable to work well with supervision and exhibited a threatening and aggressive behavior in the work place. Hollyer learned of these "issues" *one day* before terminating Plaintiff. After reviewing the record, this Court can hardly say that Defendant "conducted a detailed and thorough investigation" in this case. *Curry*, 669 F. Supp. 2d at 828; *cf. id.* (noting that in that case there were records that included numerous witness interviews and the plaintiffs had raised no hearsay or authentication objections to the defendant's investigation). The Court finds Plaintiff has raised a genuine issue of material fact as to pretext for the proffered reason for Defendant's adverse action and will **DENY** Defendant's Motion [28] on this point.

### b. Hostile Work Environment

Plaintiff has not created a genuine issue of material fact for her claims for a hostile work environment. "Under Title VII, two types of actions may be brought: (1) 'discrete discriminatory acts,' and (2) claims alleging a 'hostile work environment.'" *Hunter v. Sec'y of U.S. Army,* 565 F.3d 986, 993–94 (6th Cir. 2009) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). The Supreme Court has clarified that "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Morgan,* 536 U.S. at 115, 122 S.Ct. 2061. While the prohibition of discrete discriminatory acts guards against illegally motivated adverse employment action, a hostile work environment claim "offers employees protection from a 'workplace [] permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" *Barrett v. Whirlpool Corp.,* 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (alteration in original).

In order to prove that she was subject to a hostile work environment in violation of Title VII, Plaintiff must prove: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment and (5) Defendant knew or should have known about the harassment and failed to take action. *See Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1078–79 (6th Cir.1999). Under Michigan law, the elements are substantially the same. *See Curry*, 669 F. Supp. 2d at 833 (citing *Quinto v. Cross & Peters Co.,* 451 Mich. 358, 368–69, 547 N.W.2d 314 (1996)).

To be actionable, the complained of harassment must be severe and pervasive in two aspects: "[b]oth an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 733 (6th Cir. 2006). The Supreme Court has suggested the following factors to consider in assessing whether a work environment is hostile: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. When the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,'" a hostile environment certainly

exists. *Id.* at 21, 114 S.Ct. 367; *see also Grace v. USCAR,* 521 F.3d 655, 678–79 (6th Cir. 2008). The court "must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive." *Randolph,* 453 F.3d at 733.

After reading Plaintiff's Complaint and briefs, the Court cannot discern an argument put forth by Plaintiff to support a contention that the workplace at issue was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment. Indeed, nowhere in Plaintiff's response does she even mention the alleged hostile work environment that was created. *See generally* Dkt. No. 30.[3] Plaintiff does belong to a protected group. She allegedly was subject to unwelcome harassment based on race, as she claims that Mr. Dever referred to her as the Court's little Mexican. However, "offhand comments, and isolated incidents (unless extremely serious)" are insufficient. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

This is especially so considering Sixth Circuit precedent. For example, in one case, the Sixth Circuit affirmed summary judgment on a plaintiff's hostile work environment claim involving "a handful of uses of the n-word and its derivatives . . . some racist jokes . . ., a few references to the Ku Klux Klan and James Earl Ray," and the presence of racist graffiti that was removed after the plaintiff reported it. *See Armstrong v. Whirlpool Corp.,* 363 Fed. Appx. 317, 327 (6th Cir. 2010). In another case where a plaintiff also brought a claim under Section 1981 and Title VII, a plaintiff alleged that over the course of two years, an employee called another employee a "n***er lover;" a supervisor referred to a black co-worker as "blue;" a co-worker sang along to songs with the word "n***er" until the Plaintiff objected; and a co-worker called the plaintiff "boy" on one occasion. *See Nicholson v. City of Clarksville, Tenn.,* 530 Fed. Appx

---

[3] As Defendant argues, "Plaintiff has apparently abandoned . . . claims . . . alleging a hostile work  environment as she offers absolutely *no argument* in support of these specious claims." Dkt. No. 33 at 2.

434 (6th Cir. 2013). The Sixth Circuit expressly ruled that "[t]hese four isolated instances over the course of two years, while inappropriate and offensive, are not so severe and pervasive as to alter the terms and conditions of [plaintiff's] employment." *Id.* Consequently, the Sixth Circuit affirmed summary judgment for the employer. *Id.*

Here, Defendant points out that Plaintiff indicated that Mr. Dever did not refer to her as a little Mexican regularly. Dkt. No. 28-7 at 11(Pl. Dep.). In fact, Plaintiff appeared to indicate that it only happened one time. *Id.* Moreover, as mentioned previously there is no evidence that Dever exercised any authority over the hiring and firing of the Plaintiff. After considering the factors to determine whether an environment was permeated with discriminatory intimidation, ridicule, and insult, the court concludes that the alleged harassment described by plaintiff was not sufficiently severe or pervasive given the Plaintiff's arguments.

### 2. Counts III and V—Defendant is not entitled to summary judgment on Plaintiff's age discrimination claims.

For Plaintiff's ADEA claim, Plaintiff is required to proffer evidence of a *prima facie* case that (1) Plaintiff was at least 40 years of age; (2) she was discharged; (3) she was qualified for the position; and (4) she was replaced by a younger individual. *Skalka v. Fernald Environmental Restoration Mgt. Corp.,* 178 F.3d 414, 420 (6th Cir. 1999). "The fourth element may be satisfied by showing that 'similarly situated non-protected employees were treated more favorably.'" *Tuttle v. Metropolitan Government of Nashville,* 474 F.3d 307, 317 (6th Cir. 2007) (quoting *Talley v. Bravo Pitino Rest.,* 61 F.3d 1241, 1246 (6th Cir. 1995)). Defendant does not dispute that plaintiff was at least 50 years of age, was discharged and qualified. Again, this dispute focuses on the fourth factor and whether Plaintiff can show that similarly situated non-protected employees were treated more favorably. Just as with the prima facie case for race/national origin, Plaintiff passes this analysis. In fact, the analysis is even stronger for Plaintiff's age claim.

Again, "to be deemed 'similarly situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)). Plaintiff passes the similarly situated test more convincingly with respect to age because all of the members that she mentions—Preston, Harper, Hewitt, and Gallagher—were all substantially younger than her, and received the differential treatment discussed above. In fact, Plaintiff's testimony that Izzo told Plaintiff that Tiffani Preston was going to work with the county a lot longer than Plaintiff because Preston was younger only strengthens Plaintiff's claim for differential treatment. *See* Dkt. 30-7 at 4 (Pl. Dep.).  Put simply, Plaintiff satisfies her prima facie case.

The burden then shifts to Defendant to produce evidence of a legitimate, non-discriminatory reason for the challenged adverse employment action. *Scott v. Goodyear Tire & Rubber Co.,* 160 F.3d 1121, 1126 (6th Cir. 1998). If the defendant meets this evidentiary burden, the plaintiff is required to demonstrate that the defendant's proffered reason is a mere pretext for age discrimination. *Id.* "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000). "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Ultimately, an ADEA plaintiff must prove

"by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross,* 129 S.Ct. at 2352.

This analysis is nearly identical to the *McDonnell Douglas* analysis. As discussed, it is hard for this Court to find that Defendant had an honest belief in its rationale for terminating Plaintiff or reasonably relied on particularized facts to determine Plaintiff was unable to work well with supervision and exhibited a threatening and aggressive behavior in the work place. This Court can hardly say that Defendant "conducted a detailed and thorough investigation" in this case. This is particularly so given the apparent break from protocol in interviewing the troubled employee. *Curry*, 669 F. Supp. 2d at 828; *cf. Allen,* 545 F.3d at 398 (noting that in that case "the plaintiffs failed to produce any evidence indicating that the process the [defendant] used to conduct the investigation was irregular or idiosyncratic."). Plaintiff has come forward with evidence, construed in a light most favorable to Plaintiff, that could allow a reasonable jury to ultimately conclude that she would not have been constructively discharged "but for" her age. Accordingly, the Court will not grant summary judgement with respect to these claims.

### 3. Count VI—Defendant is not entitled to summary judgment on Plaintiff's retaliation claim pursuant to the WDCA.

In order to establish a *prima facie* case of retaliatory discharge, a plaintiff must establish that: (1) he asserted his right to workers' compensation benefits; (2) the defendant knew that plaintiff asserted his right to workers' compensation benefits; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the plaintiff's assertion of his right to workers' compensation benefits and the adverse employment action. *Dortman v. ACO Hardware, Inc.,* 405 F.Supp.2d 812, 822 (E.D. Mich. 2005) (citing *Chiles v. Machine Shop, Inc.,* 238 Mich. App. 462, 470, 606 N.W.2d 398 (1999)).

-26-

"[W]hen a plaintiff asserting a claim for retaliatory discharge under MCL 418.301(13) circumstantially establishes a rebuttable *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for its adverse employment action." *Kandler v. Dunn Paper, Inc.*, No. 14-12276, 2015 WL 632061, at *4 (E.D. Mich. Feb. 13, 2015) (quoting *Cuddington v. United Health Servs., Inc.,* 298 Mich.App. 264, 276–77, 826 N.W.2d 519 (2012)). The plaintiff is then required to demonstrate that the proffered reasons were pretextual and that the retaliation was a "motivating factor" for the adverse employment action. *Id.* Here only the fourth prong—a causal connection—is at issue.

Plaintiff relies heavily on the timing of her WDCA claim and her termination in order to support her claim. *See* Dkt. No. 30 at 8. The Court would be remiss not to point out the very short temporal proximity here as compared to other cases. *Cf. Hamilton v. Gen. Elec. Co.,* 556 F.3d 428, 435-36 (6th Cir. 2009) (finding three months combined with evidence of "heightened scrutiny" of plaintiff's performance sufficient). However, in addition to pointing out the short time frame between the WDCA claim and Plaintiff's termination, Plaintiff additionally points to the frustration exhibited by Izzo with regard to the WDCA claim as Izzo reportedly complained that the issue was "a real pain in the a**," and Plaintiff contends that Izzo "refused to process it appropriately." Dkt. No. 30 at 10. The frustration exhibited by Izzo also weighs in favor of denying summary judgment as the Court must construe facts in favor of the non-moving party.

However, while Plaintiff's arguments are convincing, it is actually Defendant's testimony that is most damning. Hollyer testified in her deposition that one role that played a factor in the termination of Plaintiff was the fact that Plaintiff had posted things on Facebook about her WDCA claim and that she felt she was being discriminated against because of her age after she grew frustrated with Defendant's processing of the claim. Defendant stated that these actions

*involving the WDCA* claim made other employees uncomfortable and played a role in Plaintiff's termination. *See* Dkt. No. 28-11 at 6 (Hollyer Dep.) ("Q. What concerns did Ms. Izzo tell you that Kelly Castillo raised? A. That she had – She said that – Ms. Brown had raised concerns on Facebook and in person where she was alleging mistreatment for her treatment when she fell in the parking lot, and, also she felt that she'd been mistreated or discriminated against because of her age. . . .Q. Okay. And you said that they raised concerns about Ms. Brown's behavior that they found threatening? What does threatening mean? A. No, not necessarily. This is was not threatening but more like negative and hostile. . . . Just raising a general feeling of hostility.").

Defendant's "response to the workplace tension that followed [the WDCA claim] could cause a trier of fact to infer that defendant perceived plaintiff as a liability who should be quieted or eliminated for the sake of workplace cohesion." *Wielen v. City of Bay City*, No. 298256, 2012 WL 407266, at *4 (Mich. Ct. App. Feb. 9, 2012) (finding that "plaintiff established more than a temporal connection between his protected activity and the decision to discharge."). The actions of Izzo only serve as extra evidence of the causal connection. The Court has already established why there is a question of fact with respect to the proffered reasons offered by Defendant. Accordingly, the Motion for Summary Judgment will be also denied with respect to this claim.

### 4. Count VII—Defendant is not entitled to summary judgment on Plaintiff's retaliation claim pursuant to the ELCRA.

Lastly, the Court will deny Defendant's motion with respect to retaliation under the ELCRA.  In order to prove retaliation under ELCRA, a plaintiff must show (1) that he/she engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that the opposition or participation was a significant factor in an adverse employment decision. *Polk v. Yellow Freight Sys.*, Inc., 801 F.2d 190, 199 (6th Cir. 1986); *see also Barrett v. Kirtland Community College*, 245

Mich.App. 306, 315, 628 N.W.2d 63 (2001). According to the Sixth Circuit, the "significant factor" standard "requires a showing of more than a 'causal link.'" *Polk*, 801 F.2d at 199

"The ELCRA defines the type of activity protected under the act and prohibits retaliation or discrimination because 'the person has opposed a violation of this act, or because the person has made a charge . . . under this act.'" *Davidson v. Allsteel, Inc.*, No. 09-11308, 2011 WL 717524, at *15 (E.D. Mich. Feb. 22, 2011) (quoting MICH. COMP. LAWS § 37.2701(a)). To constitute a "charge" under the act, "an employee need not specifically mention the act but 'must do more than generally assert unfair treatment.'" *Id.* (quoting *Barrett v. Kirtland Cmty. Coll.*, 245 Mich. App. 306, 318-19, 628 N.W.2d 63 (2001)). "The employee's charge must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to the CRA." *Id.* (citation omitted).

Defendant argues that Plaintiff cannot explain what protected activity occurred. As Plaintiff points out, however, protected activity under the ELCRA includes opposing a violation of the ELCRA. *See* MICH. COMP. LAWS 37.2701(a); *Davidson*, 2011 WL 717524, at *15; *Barrett*, 245 Mich. App. at 318-19, 628 N.W.2d 63. Here, Plaintiff complained about Izzo's age discrimination, which constitutes a protected activity and the complaint was relayed to Izzo and Hollyer two days before Plaintiff's termination. Less than a week prior to Plaintiff's termination, Izzo had given Plaintiff an "outstanding" review. Defendant admitted that Izzo learned two days before Brown's termination that Brown accused Izzo of age discrimination. Izzo took these complaints to Hollyer after learning of Brown's accusation. The Court has explained why there is a question of fact with respect to Defendant's proffered reasons for terminating Plaintiff. As a whole, looking at the facts in the light most favorable to the Plaintiff, Plaintiff has set forth evidence and facts that could cause a trier of fact to infer that Plaintiff's mentioning of her

feelings of unfair treatment was a significant factor in an adverse employment decision. Accordingly, the Court will deny the motion with respect to this claim as well.

### B. Plaintiff's Motion for Sanctions

The Court will deny Plaintiff's Motion for Sanctions because it is too vague. Plaintiff seeks an adverse inference against Defendant due to spoliation of evidence. After reading through Plaintiff's Motion for Sanctions, Plaintiff does not specify what evidence was destroyed such that this Court could give an adverse inference in her favor. Federal law of spoliation governs in this case. *See Adkins v. Wolever,* 554 F.3d 650, 652 (6th Cir. 2009). Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.,* 06–13143, 2009 WL 998402 at *1 (E.D. Mich. Apr.14, 2009) (quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999)). A federal court has "broad discretion to craft proper sanctions for spoliated evidence." *Adkins,* 554 F.3d at 651. Such sanctions include "dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Id.* at 653.

Rather than impose bright-line rules, the Sixth Circuit allows for "a case-by-case determination whether sanctions are necessary, and if so, what form they must take." *Smith v. Norcold, Inc.*, No. 13-10841, 2014 WL 5817258, at *5 (E.D. Mich. Nov. 10, 2014) (quoting *Automated Solutions Corp. v. Paragon Data Sys., Inc.,* 756 F.3d 504, 516 (6th Cir. 2014). In *Beaven v. U.S. Dep't of Justice,* 622 F.3d 540 (6th Cir. 2010), the Sixth Circuit adopted a fact-specific inquiry guided by a conjunctive three-factor test that must be satisfied before a district court can sanction a litigant for spoliation of evidence:

> First, the party with control over the evidence must have had an obligation to preserve it at the time it was destroyed. Second, the accused party must have

> destroyed the evidence with a culpable state of mind. And third, the destroyed
> evidence must be relevant to the other side's claim or defense.

*Byrd v. Alpha Alliance Ins. Corp.,* 518 F. App'x 380, 383–84 (6th Cir.2013) (citing *Beaven,* 622 F.3d at 553). In applying this three-part standard, the Sixth Circuit explained "that the obligation element is met where a defendant knows evidence might be relevant to future potential litigation." *Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 502 F. App'x 523, 532 (6th Cir. 2012) (quoting *Beaven,* 622 F.3d at 553). However, the Sixth Circuit indicated that where "there is no notice of potential litigation, there is less cause to believe the evidence was destroyed intentionally or with the intent to cover up incriminating information." *Id.* (citing *Beaven,* 622 F.3d at 553). *See id.* Ultimately, the Sixth Circuit noted that the culpable state of mind element may be satisfied by showing only that "the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.' " *Id.* (internal citation, brackets, quotations omitted).

As Defendant points out, "Plaintiff offers little to support the contention that some unidentified electronically stored information would prove relevant" to her claims. Dkt. No. 34 at 19. In fact, Plaintiff indicates that "[n]o relevant electronic communications have been identified by Plaintiff as not preserved or otherwise destroyed." Dkt. No. 34 at 67. The Court has no reason to believe otherwise. Because Plaintiff does not specify the evidence she would like an adverse inference for, her argument seems speculative at best. *Cf. Richins v. Deere and Company*, 231 F.R.D. 623, 626 (D.N.M. 2004) (finding the evidence upon which the movant relies to show bad faith must be more than conjecture or speculation; the movant must present evidence that would support an inference that a party actually suppressed or withheld evidence because they were conscious of a weakness in their case); *Crandall v. City and County of Denver,* 2006 WL 2683754, *2 (D.Colo.2006) (declining to create a presumption in favor of spoliation whenever a

moving party can prove that records that might have contained relevant evidence have been destroyed); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 635 (D. Colo. 2007). Accordingly, the Court will deny Plaintiff's Motion for sanctions.

## V. CONCLUSION

For the reasons discussed, the Court will **GRANT** in part and **DENY** in part Defendant's Motion for Summary Judgment. All of Plaintiff's claims will go to trial except the claims for the creation of a hostile work environment. Moreover, the Court will **DENY** Plaintiff's Motion for Sanctions.

IT IS SO ORDERED.

Dated: September 4, 2015

/s/ Gershwin A Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge